Case Nos. 23-SW-00096-JAM
23-SW-00097-JAM
23-SW-00098-JAM
23-SW-00099-JAM
23-SW-00100-JAM
23-SW-00101-JAM
23-SW-00102-JAM
23-SW-00103-JAM

## AFFIDAVIT

I, Martin H. Dye, being first duly sworn, hereby depose and state as follows:

1. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) and have been so assigned since October 2015. I am currently a Detective with the Lafayette County Drug Task Force (LCDTF). I was previously a deputy sheriff with the Lafayette County Sheriff's Office (LCSO) from 2005 to 2014. I have been employed with the LCSO since August of 2002. During my assignment with the LCDTF, and my current assignment with DEA, I have participated in numerous investigations of individuals who have violated narcotic laws of the states of Missouri and Kansas, as well as the United States of America. In connection with my official duties as a TFO of the DEA, I investigate violations of federal criminal law, including, but not limited to, violations involving controlled substances, firearms, money laundering and other financial crimes, robbery and related offenses, and fugitives. I have received specialized and on-the-job training in the enforcement of a wide variety of federal law violations, including those set out herein. I am currently assigned to the DEA's Kansas City District Office's Kansas City Interdiction Task Force (KCITF). As a DEA TFO assigned to the KCITF my official duties

include but are not limited to investigation into criminal violations of the Controlled Substances Act and ongoing criminal enterprises. My training and experience have involved, among other things, (a) the debriefing of defendants, witnesses, and informants with knowledge of the distribution and transportation of controlled substances and laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; (d) use of legal process to obtain evidence, and (e) wire intercept investigations. Based on this training and experience, I have become familiar with the way controlled substance traffickers conduct their criminal enterprises, including the methods employed by these distributors to import and distribute their product, including the use of coded language to refer to controlled substances, drug proceeds, related criminal acts and other aspects of drug trafficking and money laundering enterprises. I received specific law enforcement training for the investigation of money laundering offenses. I participated in investigations of the possession, manufacture, transportation, and distribution of all manner of controlled substances. I have also acquired knowledge and information about other federal law violation investigations from on-the-job training, other law enforcement officers, and other investigations that I have conducted or which I have participated.

3. The information contained in this affidavit is based upon my investigation and information provided to me and others in this investigation by persons and agencies that are believed to be reliable. Except where otherwise noted, Special Agents of the DEA, other law enforcement officers, or other third parties have provided the information set forth in this affidavit to me either directly or indirectly. As such, information this affidavit may not reflect my personal knowledge, observations, or investigations, but it is information I am aware of, believe to be reliable, and adopt herein for the purposes of this affidavit. Because this affidavit is being submitted for the limited purpose of securing authority to search the eight herein

2

designated and identified **Target Devices,** I have not included every fact known about this investigation.

4. Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C.§ 841, 21 U.S.C. § 846, and other federal law violations have been committed, are being committed, and will continue to be committed by **Wilmer MENDOZA-Perez, Luis NIETO-Acosta, Miguel ANGUIANO-Viera and Jose ACOSTA-Bermejo.**

5. This Affidavit is submitted in support of an application for a Search Warrant for the following digital devices related to those violations, hereinafter referred to as the "**Target Devices**":

   a. **Target Device #1:** Claimed by **MENDOZA-Perez**: a black Samsung smartphone, International Mobile Equipment Identity (IMEI) 354327824593957.
   b. **Target Device #2:** Claimed by **MENDOZA-Perez**: a blue Nokia smartphone, IMEI 358205606932070.
   c. **Target Device #3:** Claimed by **ACOSTA-Bermejo**: a blue iPhone with green case.
   d. **Target Device #4:** Claimed by **NIETO-Acosta**: a blue Samsung smartphone with black case, IMEI 358122561393885.
   e. **Target Device #5:** Claimed by **NIETO-Acosta**: a Motorola model XT1263-1 smartphone, IMEI 351108832049619.
   f. **Target Device #6:** Claimed by **ANGUIANO-Viera**: a blue iPhone.
   g. **Target Device #7:** Claimed by **S.J.M. (JUVENILE)**: a black iPhone with black case.
   h. **Target Device #8:** Unknown owner, located in Toyota Highlander occupied by **NIETO-Acosta** and **ACOSTA-Bermejo**: an Alcatel model 9032Z smart tablet, IMEI 016095007159561.

6. On January 24, 2023, Master Sergeant R.B. McGinnis of the Missouri State Highway Patrol (MSHP) stopped a 2022 Penske rental truck for cutting in on an overtaken vehicle.

3

The stop occurred approximately at the mile 46 marker on eastbound Interstate 70 in Lafayette County, Missouri, within the Western District of Missouri.

7. Prior to the stop, a white Toyota Highlander, later determined to be occupied by **Luis NIETO-Acosta** and **Jose ACOSTA-Bermejo** attempted to prevent MSgt. McGinnis from getting behind the Penske truck to initiate a stop. During MSgt McGinnis' contact with the driver of the Penske truck, identified as **Wilmer MENDOZA-Perez**, MSgt. McGinnis noticed he began drinking water from a water bottle and was shaking.

8. Via the Penske truck rental agreement, MSgt. McGinnis discovered the truck had been rented in Oklahoma City, Oklahoma, on January 20th, 2023, by a female who was not present in the rental truck. The truck was to be returned to a Home Depot in Fullerton, California, on January 26th, 2023. **MENDOZA-Perez** had no plausible reason for his route of travel or for his trip. MSgt. McGinnis requested and was granted consent to search the rental truck. A search of the truck revealed two boxes containing a total of 34 kilograms of suspected cocaine (2 separate kilos tested positive for cocaine via a Tru-Narc filed testing device). The current average street price in the Kansas City Metropolitan area for a kilogram of cocaine is approximately $30,000.00 per kilogram.

9. **MENDOZA-Perez** was placed under arrest. He subsequently admitted (post *Miranda*) that the above referenced Highlander was operated by his associates. MSHP Corporal B. Ryun located the Toyota Highlander abandoned at the Pilot truck stop at the mile 49 marker.

10. Review of the Pilot truck stop's surveillance video revealed that a third vehicle, later identified as occupied by **Miguel ANGUIANO-Viera** and a juvenile female (a white Honda Pilot), arrived at the truck stop and picked up the occupants of the Highlander, identified as **NIETO-Acosta** and **ACOSTA-Bermejo**. On that video you can see **Miguel** and **NIETO-Acosta**

4

have an animated conversation outside the two vehicles. **NIETO-Acosta** appears to be very agitated, based on his actions seen in the video.

11. A short time later, this vehicle was located, and the occupants arrested. **NIETO-Acosta, ACOSTA-Bermejo, ANGUIANO-Viera** and the juvenile female were arrested when they stopped at a convenience store in Odessa, Missouri, also within the Western District of Missouri.

12. On January 24, 2023, your affiant, along with DEA Kansas City Interdiction Task Force (KCITF) Task Force Officer (TFOs) Sargis Zadoyan, and Adriane Ferrer responded to the scene. We conducted post-*Miranda* interviews with **MENDOZA-Perez**, **NIETO-Acosta**, **ACOSTA-Bermejo** and **ANGUIANO-Viera**.

13. **MENDOZA-Perez**, the driver of the Penske truck, was interviewed first. TFO Ferrer, who is fluent in Spanish translated during the interview. **MENDOZA-Perez** stated his wife Ana Karina ROSE rented the Penske truck because she had an identification card. **MENDOZA-Perez** stated he was asked to have his wife to rent the truck to transport beds. **MENDOZA-Perez** stated **NIETO-Acosta** and **ACOSTA-Bermejo** were traveling with him. **MENDOZA-Perez** knew **NIETO-Acosta** and **ACOSTA-Bermejo** for about one year. **MENDOZA-Perez** was driving the Penske truck and **NIETO-Acosta** and **ACOSTA-Bermejo** were following him in a different vehicle. **ACOSTA-Bermejo** was going to pay **MENDOZA-Perez** $2,000.00 for the trip. **MENDOZA-Perez** at first stated he did not know what was in the truck, and the reason he drove the Penske truck because he needed money. **MENDOZA-Perez** stated **ACOSTA-Bermejo** and **NIETO-Acosta** were following him to make sure police did not stop the Penske truck. **MENDOZA-Perez** stated he was given a phone to communicate with **NIETO-Acosta** and **ACOSTA-Bermejo**. **MENDOZA-Perez** stated they drove from Oklahoma, where the Penske

5

truck was rented, to Los Angeles, CA. **MENDOZA-Perez** claimed while he went out to eat, **ACOSTA-Bermejo** and **NIETO-Acosta** loaded the truck. **MENDOZA-Perez** stated there were two (2) cars, one was in front of the Penske truck, and one was following the Penske truck.

14. **MENDOZA-Perez** later changed his statement and stated he saw the boxes containing the cocaine being loaded in the truck. **MENDOZA-Perez** stated **ACOSTA-Bermejo** removed the bundles of cocaine from the original boxes and placed them in new boxes. **MENDOZA-Perez** stated the original boxes containing the cocaine were in the truck. **MENDOZA-Perez** claimed he did not touch the drugs and only touched the boxes containing the drugs. **MENDOZA-Perez** stated **ACOSTA-Bermejo** touched the drugs. **MENDOZA-Perez** stated he thought **ACOSTA-Bermejo** was in charge since he touched the drugs. **MENDOZA-Perez** stated they switched the boxes containing the cocaine at a Walmart parking lot and **NIETO-Acosta** was doing surveillance for them. **MENDOZA-Perez** stated he was sure **NIETO-Acosta** knew about the drugs because **ACOSTA-Bermejo** and **NIETO-Acosta** were riding in the same car together. **MENDOZA-Perez** stated he heard them talking about taking cocaine from Los Angeles to Atlanta, GA and were taking money back to Los Angeles. **MENDOZA-Perez** stated he was given $1,200 to pay for the Penske truck and further stated he was going to get paid $5,000.00. **MENDOZA-Perez** stated this was his first time making the trip, but he heard that **NIETO-Acosta** and **ACOSTA-Bermejo** made several trips.

15. **MENDOZA-Perez** stated the car driving in front of the Penske truck had paper plates and the passenger was a girl sixteen or seventeen years old. **MENDOZA-Perez** stated the driver of the car in front of the Penske truck was a younger male with no facial hair, and named him as "Guero," or "white guy." **MENDOZA-Perez** claimed he didn't know about the drugs until they got to Los Angeles.

6

16. Consent to search **MENDOZA-Perez'**s cellular phone was granted by **MENDOZA-Perez**. While viewing **MENDOZA-Perez's** cellular phone, your affiant observed a video with two cardboard boxes containing kilogram packages that were identical to the kilograms packages of cocaine located in the Penske truck. The video was taken in what appeared to be a motel room. Two other persons were seen in the video, although not their faces. **ACOSTA-Bermejo** was wearing at his arrest a shirt that appears to be the same shirt seen in the video. **NIETO-Acosta** is seen on the Pilot truck stop wearing a shirt that appears to be the same as the other shirt in the video and wearing it in the same manner. Your affiant also observed photographs of **MENDOZA-Perez's** wife's driver's license, whom was the listed renter for the Penske truck **MENDOZA-Perez** was driving. Your affiant also observed a navigation system was currently running with a final destination of Atlanta, Georgia. Your affiant also observed **MENDOZA-Perez** had two contacts saved in his phone as "Luis Mexi" and "Jose Mexi". Your affiant believed these to be **NIETO-Acosta** and **ACOSTA-Bermejo**. It was later confirmed with **MENDOZA-Perez** the numbers saved as "Luis Mexi" and "Jose Mexi" were cellphone numbers **NIETO-Acosta** and **ACOSTA-Bermejo** provided **MENDOZA-Perez.**

17. TFO Zadoyan, TFO Ferrer and TFO Dye then conducted a post-*Miranda* interview with **NIETO-Acosta**. TFO Ferrer translated the interview. **NIETO-Acosta** stated the white Toyota belonged to him. **NIETO-Acosta** stated they started the trip from Oklahoma with his cousin and were going to St. Louis to visit family. **NIETO-Acosta** identified his cousin as Jose (**ACOSTA-Bermejo**.) **NIETO-Acosta** claimed he did not know who was driving the Penske truck and further stated he was just behind the truck. **NIETO-Acosta** further stated that he was not following the Penske truck but happened to be driving behind the Penske truck.

7

18. **NIETO-Acosta** was told that he was not being truthful, and he changed his story and stated **MENDOZA-Perez's** wife, whom he did not know, rented the truck. **NIETO-Acosta** stated the name of the driver of the Penske truck was Antony Valle. They rented the Penske truck because Antony Valle (**MENDOZA-Perez**) was going to move furniture. **NIETO-Acosta** stated he was told to drive behind the Penske truck but refused to disclose who told him to drive behind the Penske truck. **NIETO-Acosta** stated he was called and was told on the phone about the job and to go drive behind the Penske truck. **NIETO-Acosta** was asked to show the agents the phone number in his phone that called him, and **NIETO-Acosta** claimed he deleted the phone number, and further stated it was a different phone, which was not with him.

19. When **NIETO-Acosta** was asked where they drove from Oklahoma, **NIETO-Acosta** stated from Oklahoma directly to Missouri. **NIETO-Acosta** stated he did not help load the Penske truck. **NIETO-Acosta** stated at some point he was going to get paid for the trip but was not told how much he was going to get paid. **NIETO-Acosta** stated **ACOSTA-Bermejo** was the only one in his vehicle. **NIETO-Acosta** did not know if **ACOSTA-Bermejo** was going to get paid, and further stated **ACOSTA-Bermejo** did not know anything.

20. **NIETO-Acosta** was again told that he was not telling the truth and at this time he stated they drove from Oklahoma to Los Angeles, CA. **NIETO-Acosta** stated that the brother and cousin of Miguel Angel (**Miguel Angel ANGUIANO-Viera**) picked up the drugs, and the drugs were picked up at a hotel. **NIETO-Acosta** stated that **ANGUIANO-Viera's** brother was in Los Angeles. **ACOSTA-Bermejo** and **NIETO-Acosta** were "working," but he was not told how much he was going to get paid. **NIETO-Acosta** stated he knew they were going to pay him but did not know how much. **NIETO-Acosta** stated he did not know how much money they were going to pick up after the drugs were delivered, but he knew they were supposed to pick up money.

**NIETO-Acosta** stated they were supposed to deliver the money back to Los Angeles the day after the drugs were delivered.

21. When **NIETO-Acosta** was asked about if they picked up money from their last trip, **NIETO-Acosta** stated they did not pick up money from their last trip. **NIETO-Acosta** was asked further about his last trip, and he stated he did not want to talk about it and stated he did not want to talk further, and his last statements were truthful.

22. **NIETO-Acosta** consented to a search of his cellular phone. While your affiant was searching **NIETO-Acosta's** cellular phone, your affiant observed photographs of GPS directions from December 12, 2022, showing **NIETO-Acosta** was traveling to the Atlanta, Georgia area. Your affiant also observed photographs were **NIETO-Acosta** appeared to be following a U-Haul box truck on October 21, 2022. While viewing **NIETO-Acosta's** photographs in his cellular phone, your affiant observed a photograph of a one-dollar bill, specifically the serial number to said dollar bill, D94891225D. This photograph was taken on January 19, 2023. This is a common tactic used by couriers to confirm the person they are meeting with to conduct illegal drug proceed transactions is in fact who they are supposed to meet with and exchange illegal drug proceeds. This same dollar bill from the photograph was located in the possession of **NIETO-Acosta**.

23. TFO Zadoyan, TFO Ferrer and TFO Dye then attempted to interview **ACOSTA-Bermejo**. **ACOSTA-Bermejo**, after reading his Miranda rights, requested an attorney, therefore no interview was conducted.

24. TFO Zadoyan, TFO Ferrer and TFO Dye then conducted a post-*Miranda* interview with **ANGUIANO-Viera** in English. **ANGUIANO-Viera** stated he resided in Oklahoma City, Oklahoma, for approximately two years. **ANGUIANO-Viera** stated he was driving the white Honda, which belonged to **ACOSTA-Bermejo**. **ANGUIANO-Viera** did not know when

9

ACOSTA-Bermejo got the Honda. ACOSTA-Bermejo was not riding in the Honda with him. ANGUIANO-Viera stated the seventeen-year-old girl was riding with him in the Honda. ANGUIANO-Viera stated they went from Oklahoma to Los Angeles to visit family. NIETO-Acosta and ACOSTA-Bermejo drove the other white car. ANGUIANO-Viera claimed he did not know the driver's name of the Penske truck. ANGUIANO-Viera stated he and the seventeen-year-old girl left Oklahoma first and drove to Los Angeles. NIETO-Acosta and ACOSTA-Bermejo drove from Oklahoma to Los Angeles two and half days later. ANGUIANO-Viera did not see the Penske truck until it was in Los Angeles. ANGUIANO-Viera claimed he did not know why NIETO-Acosta, ACOSTA-Bermejo and MENDOZA-Perez went to Los Angeles, and stated they called him because they were friends, and he was driving ACOSTA-Bermejo's Honda. ANGUIANO-Viera stated his brother's name in Los Angeles was Freddy Anguiano-Viera. In Los Angeles ANGUIANO-Viera, NIETO-Acosta, ACOSTA-Bermejo and MENDOZA-Perez did not do anything together. ANGUIANO-Viera stated they were all together driving back from Los Angeles to Oklahoma City, but they told him they were going to drive through St. Louis. ANGUIANO-Viera further stated he wasn't even near the Penske truck. At this time ANGUIANO-Viera requested an attorney and the interview was stopped.

25. MENDOZA-Perez was then brought in for a second interview where he identified ANGUIANO-Viera as "Guero." MENDOZA-Perez stated ANGUIANO-Viera's cousin gave them the boxes containing the cocaine in Los Angeles. MENDOZA-Perez stated ANGUIANO-Viera, NIETO-Acosta and ACOSTA-Bermejo knew about the drugs in the truck. MENDOZA-Perez stated that ANGUIANO-Viera, NIETO-Acosta and ACOSTA-Bermejo made several prior trips. MENDOZA-Perez stated that he was asked several times to make the trip, but he did not agree before. MENDOZA-Perez stated he thought ANGUIANO-Viera and ACOSTA-

10

**Bermejo** were more in charge and **NIETO-Acosta** was assisting by driving another car and warning them if any police were seen on the highways. **MENDOZA-Perez** knew **ANGUIANO-Viera** was involved because from previous conversations he heard that **ANGUIANO-Viera** had the contacts. **MENDOZA-Perez** stated during this trip **ANGUIANO-Viera**, and **ACOSTA-Bermejo** talked to him at a gas station and told him they were going to pay **MENDOZA-Perez** $5,000.00 instead of $10,000.00 because **ANGUIANO-Viera's** cousin did not have everything. **ANGUIANO-Viera** and **ACOSTA-Bermejo** told **MENDOZA-Perez** they were going to move 100 kilograms and he could make more money.

26. During his interview, **MENDOZA-Perez** stated the two escort vehicles, the white Honda, and the white Toyota, were recently purchased for this trip. Additionally, during his statement, **NIETO-Acosta** stated his vehicle, the white Toyota, was recently purchased for $2,500.00.

27. Consent to search the white Toyota Highlander escort vehicle was obtained from **NIETO-Acosta**. Two handguns were located in the Toyota Highlander escort vehicle. A Taurus Arms 9 mm handgun was in a gray bag located behind the drivers front seat with one (1) loaded magazine, and another Taurus Arms 9 mm handgun with three (3) magazines in a tan suitcase was located behind the front passenger seat. With the second Taurus 9mm handgun was a receipt showing the name **Jose Eduardo ACOSTA-Bermejo** as the purchaser with an address of 306 South 109th East Avenue in Tulsa, Oklahoma with a phone number of 405-249-5983. Both handguns were identical makes and models. Additionally, a roll of fiberglass imbedded packing tape was located. It matched the tape on the boxes containing the kilos of cocaine. Finally, a debit card found in the Highlander matched a fuel receipt which was found in the Penske truck. The debit card was listed under **Luis Gerardo NIETO**.

28. Consent to search **NIETO-Acosta's** cellular phone was obtained. While viewing **NIETO-Acosta's** photographs in his cellular phone, TFO Dye observed a photograph of a one-dollar bill, specifically the serial number to said dollar bill, D94891225D. This photograph was taken on January 19, 2023. This is a common tactic used by couriers to confirm the person they are meeting with to conduct illegal drug proceed transactions is in fact who they are supposed to meet with and exchange illegal drug proceeds.

29. While reviewing surveillance video from the Pilot truck stop, where **NIETO-Acosta, ACOSTA-Bermejo, ANGUIANO-Viera and S.J.M.** meet, it can be observed all four subjects begin using their cellular phones. It can be observed **ACOSTA-Bermejo** is on the phone more than anyone else and appeared to be yelling at **ANGUIANO-Viera**. It also appears **NIETO-Acosta** and **ANGUIANO-Viera** are waiting for **ACOSTA-Bermejo** to give some direction or instruction.

30. Currently, all **Target Devices** are in DEA custody, being stored in the Non-Drug Exhibit room at the DEA's Kansas City District Office (KCDO), located in Overland Park, Kansas. Upon receiving search warrants for the **Target Devices**, the **Target Devices** will be removed from the KCDO's Non-Drug Exhibit room and transported to Midwest HIDTA, located in Kansas City, Missouri, for execution of the search warrants on all **Target Devices**.

31. Not each of the **Target Devices** were able to be identified as being specifically used in these crimes. However, the facts herein clearly demonstrate the use by these individuals of various electronic devices to aid in the alleged crimes and their aftermath, including avoiding detection. Therefore, I believe probable cause exists to search each of the **Target Devices** seized from the involved individuals and vehicles.

32. On February 7, 2023, a Grand Jury within the Western District of Missouri indicted all four of these defendants on charges of 21 U.S.C. Section 841 et seq (Controlled Substance violations). **NIETO-Acosta** and **ACOSTA-Bermejo** were also indicted on federal firearm charges. All are currently in custody.

33. Based on the foregoing, affiant believes there is probable cause to search the **Target Devices** because evidence related to the charged crimes and the on-going criminal investigation and the continued related illegal actions of parties assisting the charged crimes will be found on the **Target Devices.**

*FURTHER AFFIANT SAYETH NAUGHT.*

_____
MARTIN H. DYE
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn to ~~before me~~ Telephonically this 8th day of ~~February 2~~ March 023. at 5:07 p.m.

_____
HONORABLE JILL A. MORRIS
United States Magistrate Judge
Western District of Missouri

13